IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**BLUEFIELD DIVISION**

Larry H.,

      Plaintiff,

v.                                  CIVIL ACTION NO. 1:23-cv-163

MARTIN J. O'MALLEY
Commissioner of Social Security,[1]

      Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Larry H. ("Plaintiff") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. By standing order, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 5.) Presently pending before this Court are Plaintiff's Brief in Support of Plaintiff's *Motion for Judgment on the Pleadings* (ECF No. 11), and the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 12).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's request to reverse the Commissioner's decision (ECF No. 11), **DENY** the

---

[1] Commissioner O'Malley was substituted in place of Acting Commissioner Kilolo Kijakazi following O'Malley's appointment on December 20, 2023.

Commissioner's request to affirm his decision (ECF No. 12), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

## I.    BACKGROUND

### A. Information about Plaintiff and Procedural History of Claim

Plaintiff was 43 years old at the time of his alleged disability onset date and 46 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 79-110, 387.)[2] It is undisputed that at all relevant times, Plaintiff was a younger individual whose age would not seriously affect his ability to adjust to work. He has a high school education, where he participated in special education classes; he reported having limited literacy (Tr. 362-367). Plaintiff has past work experience as a shuttle car operator and scoop operator for a coal mine, as well as a school bus driver (Tr. 362-368). Plaintiff alleges that he became disabled on February 1, 2019, due to chronic left-foot pain associated with previous metatarsal bone fractures, gait abnormality from a crush injury, nerve damage to the left foot, and bilateral carpal-tunnel syndrome (Tr. 366). At that time, Plaintiff did not allege any mental impairments (Tr. 157-58).

Plaintiff filed his application for benefits on April 15, 2019 (Tr. 82). The claim was initially denied on July 28, 2020, and then denied again on reconsideration on November 20, 2020 (Tr. 174, 215, 244-255.) Thereafter, on January 6, 2021, Plaintiff filed a written request for hearing (Tr. 263). An administrative hearing was held before an ALJ by videoconference on February 24, 2022 (Tr. 111-126, 304-314). On June 8, 2022, the ALJ entered an unfavorable decision (Tr. 82-102). The Appeals Council denied Plaintiff's

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 8.

subsequent request for review on January 4, 2023, and the ALJ's decision became the final decision of the Commissioner on that date (Tr. 1-3).

Plaintiff timely brought the present action on February 24, 2023, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g) (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on April 21, 2023 (ECF No. 8). Plaintiff subsequently filed her *Brief – Social Security* (ECF No. 11), and in response, the Commissioner filed his *Brief in Support of Defendant's Decision* (ECF No. 12). Plaintiff then filed her Response to *Brief in Support of Defendant's Decision* (ECF No. 13). As such, this matter is fully briefed and ready for resolution.

### B. Relevant Evidence

The undersigned has considered all evidence of record, including the medical evidence,[3] pertaining to Plaintiff's arguments and summarizes the relevant portions here for the convenience of the United States District Judge.

### 1. Treatment Records

Plaintiff's mental-health treatment records begin in July 2017, with the assessment by PA-C Misty Meadows at Southern Highlands Community Mental Health Center (Southern Highlands) (Tr. 458-463). At that time, Plaintiff asserted that he was having bad dreams and intrusive thoughts about being pinned under a rock while working as a coal miner (Tr. 458). He had lost interest in previously enjoyable activities, avoided social interaction, expressed paranoid ideation, gets angry and feels like choking people, is distressed about not being able to play with his than three-year-old daughter, and approximately three months earlier had experienced suicidal ideation. *Id.* His mood was

---

[3] Because it is undisputed that Plaintiff's allegations of error solely concern mental impairments, his physical impairments are outside the scope of the instant *Proposed Findings & Recommendation* (*See* ECF No. 11 at 7 n.7).

anxious and concrete, his sociability was described as "guarded," his insight and judgment were only fair and he has low intelligence (Tr. 461). He was diagnosed with posttraumatic stress disorder ("PTSD") and unspecified bipolar and related disorder, and prescribed risperidone and trazodone (Tr. 462).

A month later in August 2017, Plaintiff's mood was distressed and anxious and his affect was constricted (Tr. 464). Trazodone was continued but it appears that risperidone was changed to Wellbutrin (Tr. 465). In September 2017, Plaintiff reported some improvement with Wellbutrin, but that he was still having anger outbursts, strong feelings of worthlessness, poor sleep, and continued social isolation (Tr. 466). His mood continued to be depressed and anxious and his affect restricted. *Id.* It appears that Wellbutrin was continued but that Vistaril was added for anxiety; he was also prescribed Trileptal (Tr. 467).

In October 2017, Plaintiff reported that his anger was better, his sleep was still poor with increasing bad dreams, and that he continued to avoid the public (Tr. 468). His mood was still depressed and anxious and his affect constricted (Tr. 469). While different medication adjustments and combinations were tried over the next six months, with varying success in lessening the severity of Plaintiff's symptoms (Tr. 469-474). In February 2018, Plaintiff requested a stronger dose of Remeron; at that visit, Plaintiff rated his depression at an eight out of ten, with passive suicidal ideation (Tr. 474). He refused Trazodone, explaining that it gave him nightmares when he used it before (Tr. 474-476). In February 2018, Plaintiff rated his depression at an 8 out of ten, with anxiety at a 6 out of ten (Tr. 476). Plaintiff reported that he was still having anger outbursts, and agreed to another antidepressant change, this time to Prozac from Wellbutrin) (Tr. 476-478). In June 2018, Plaintiff continued to report an irritable mood, along with having continued

feelings of depression, moderate anxiety, and variable sleep. *Id.* However, Meadows cited no current suicidal ideation, and apparently did not order further medication changes (Tr. 478).

In July 2018, a clinical reevaluation was performed by Southern Highlands (Tr. 453-455). The report indicated that Plaintiff continued to have symptoms of severe withdrawal and agitation, anxiety, panic, paranoia, suspiciousness, oppositional behavior, and hostility. *Id.* His depression and associated symptoms of hopelessness, guilt, self-neglect, loss of interest in activities, hallucinations, circumstantial thinking distractibility, variable energy, sleep disorder, and verbal aggression were considered moderate. *Id.* He acknowledged that medication had improved things, to the extent that his depression "was a 9 on the Likert Scale before taking his medication but now reports it as a 6" (Tr. 453). His auditory and visual hallucinations were less frequent and had improved with medication, but nonetheless he continued to experience them on a daily basis, and in fact reported hearing "the voices" more often every day; he reported that he interacted frequently with these auditory hallucinations (Tr. 453-455). He was described as having "significant impairment in social situations," and he admitted to being "easily angered for no reason and can be physically aggressive at times," though not outright physically violent (Tr. 453). Despite the slight improvement with medication, Plaintiff stated that he continued to periodically experience mood swings "that last about an hour," when he will "go off the wall." *Id.* He rated his hostility, verbal aggression, and physical aggression as a 5, with oppositional behavior at a 5 as well. *Id.* He was found to "have significant impairment in social situations," with severe withdrawal, and as a result reported "feeling like he no longer has friends" (Tr. 455). Finally, Plaintiff reported that he lived with his parents because he could not take care of himself (Tr. 455). He was

diagnosed at this point with schizoaffective disorder, bipolar type, with a plan to "continue pharmacological management services to help manage and reduce psychiatric symptoms and increase functioning levels." (Tr. 454-455).

Plaintiff also had a regularly scheduled appointment at Southern Highlands in July 2018 which (somewhat redundantly) described his mood as irritable, along with reported symptoms of racing thoughts at night, poor sleep, extreme frustration, and passive suicidal ideation (Tr. 792). His mood was depressed and anxious, and his affect was constricted. *Id.* It appears that his medications of Remeron, Vistaril, and Prozac were continued (Tr. 793).

In September 2018, Plaintiff reported experiencing more frequent irritable moods, and four outbursts since his last visit (Tr. 794). He reported that he continued to avoid the public and was unable to attend his daughter's school functions (Tr. 794-796). Additionally, he reported racing thoughts at night, poor sleep, panic attacks, and ongoing passive suicidal ideation.

In December 2018, Plaintiff continued to rate his depression symptoms high, at an 8/10 (Tr. 796). He also reported ongoing irritable mood, restricted affect, decreased energy, poor sleep, moderate anxiety, and continued isolation; however, he was able to take his medications as ordered. (Tr. 796-799). The treatment plan was to adjust Plaintiff's medication once again, tapering down the Remeron and replacing it with Amitriptyline.

In March 2019, Plaintiff claimed that his depression had worsened to a 9/10, with an ongoing irritable mood, constricted affect, and decreased energy, even though it appears that medication was continued as previously ordered (Tr. 798-800). The same is true in May 2019, when Plaintiff reported ongoing irritable mood, with an 8/10

depression, continued passive suicidal ideation, and no current hallucinating (Tr. 800-803). Continuing with medication adjustment, the treatment plan was to add Depakote and increase Wellbutrin. *Id.*

On July 9, 2019, Plaintiff followed up at Highlands where he reported that he continued to have moderate depression and anxiety (Tr. 779). He reported that, while he does not get as angry as easily, like he once did, he will occasionally get angry and punch a wall or throw or break something. *Id.* He stated that he only has this problem if someone were to "tick him off." *Id.* Furthermore, Plaintiff reported that he was withdrawn, stayed home most of the time and preferred to lay around the house (Tr. 781). However, Plaintiff stated that he was not interested in individual counseling (Tr. 781, 828). He reported continuing to be withdrawn, but reported that he can take care of his necessities, "always" wants to shower and get dressed, and is able to keep his doctor's appointments (Tr. 781). Meadows noted on July 10, 2019 that Plaintiff has a combination of emotional/mental problems and psychiatric symptoms which affect his ability to interact appropriately with coworkers and supervisors.

By September 2019, Plaintiff reported constant depression, variable irritability, with ongoing occasional anger outbursts, as well as passive suicidal ideation several weeks earlier because he was "mad at the world," though he indicated that he had none presently; Plaintiff's current mood described as "up-and-down." In October 2019, Plaintiff continued to rate his depression at an 8 out of 10, and additionally reported that he was having three extreme "blowups" per week (Tr. 808-10, 811-13). December 2019 showed few changes; Plaintiff continued to report feelings of continued isolation, ongoing passive suicidal ideation, continued depression, variable irritability, and "fair" sleep. (Tr. 811-13).

By January 2020, Plaintiff showed "no change in mood," with ongoing feelings of "depression and worthlessness in spite of medication management," including occasional irritability and anger, continued isolation, moderate anxiety, ongoing passive suicidal ideation (Tr. 828). Plaintiff reported that his occasional irritability and anger was triggered specifically in group or public settings. *Id.*

At this point the Southern Highlands records do not pick up again until January 2021. At this time (with no mention of any break in treatment) the record essentially picks up where it left off, describing Plaintiff with ongoing chronic depression and hopelessness, poor sleep, and irritability (Tr. 990). In March 2021, Plaintiff reported he was severely depressed with a plan to hang himself, even sitting with the rope in his hands for hours as he contemplated this (Tr. 988). He continued to have poor sleep, high anxiety, and ongoing anger and irritability. *Id.* There appears to have been no change in his medications during this gap, although it is possible that risperidone was added. *Id.*

On March 8, 2021, Plaintiff returned to Southern Highlands for a "crisis stabilization" visit, where he discussed in more detail his recent suicide plan as related to his ongoing frustrations with his inability to work and perform as a father the way he feels like he should, as being "less than a man" (Tr. 987). Plans were made to continue follow-up through direct intervention; it does not appear that any medication changes were ordered (Tr. 985-986). He participated in a group therapy related to this crisis stabilization over the following several days (Tr. 962-984). On March 17, 2021, Plaintiff had an individual therapy appointment reporting some improvement in his mood but still having variable irritability, and moderate anxiety (Tr. 961). Plaintiff reported that he still had chronically low energy and was very isolated, not leaving his home often, due to his impulsivity. *Id.*

Plaintiff's next visit at Southern Highlands was in April 2021 (Tr. 1476). Plaintiff continued to rate his depression and anxiety at 8/10, continued to report isolating himself at an extreme level, and continued to report poor sleep despite compliance with his course of prescribed medication. *Id.* PA-C Meadows noted that his moods were "not stable for gainful employment" (Tr. 1478). However, it does not appear that any medication changes were made. *Id.* In August 2021, it was noted that Plaintiff had recent a heart attack and reported that this experience increased his depression (Tr. 1479-81). Plaintiff rated his anxiety as  moderate-to-severe, with poor sleep, though he denied "current suicidal ideation" (Tr. 1485).

Plaintiff reported in January 2022 that he continued to have an ongoing depressed mood, severe anxiety, and poor sleep (Tr. 1488-90). Similarly, in March 2022, though Plaintiff reported that his moods were "fair," and thus somewhat improved, with no "current" suicidal ideation; however, he also continued to experience ongoing chronic anxiety with associated irritability, along with poor sleep (Tr. 29-31). By June 2022, Plaintiff's depressed mood had worsened again, with reports of current passive suicidal ideation a few times a week, without a plan (Tr. 32-34). He also reported feelings of worthlessness because of his cardiac condition and inability to provide for his family. *Id.* He reported poor sleep and racing thoughts at night. *Id.* Once again, an adjustment was made to Plaintiff's medication, with an increase to his Risperidone and Amitriptyline prescriptions. In August of 2022, Plaintiff's depression continued to be rated at an 8/10, with continued poor sleep. *Id.*

### 2.  *Opinion Evidence*

Psychologist and consultative examiner (CE) Elizabeth Bodkin, M.A., examined and evaluated Plaintiff on order of the State Agency in January 2020 (Tr. 835). Noting

Plaintiff's self-described mental health history of recurrent major depression episodes since approximately 2012 and inability to work since 2016, CE Bodkin found that Plaintiff has persistently depressed mood, with loss of interest in activities, unsatisfying sleep, helplessness, pessimism, feelings of worthlessness, failure, guilt, blame, crying episodes, and anger (Tr. 836). On exam, the CE's observations confirmed depressed mood and restricted affect, only fair insight, mild impairment of memory and concentration with normal persistence but "somewhat slow" pace (Tr. 837). The CE diagnosed major depressive disorder, recurrent, moderate, repeating the above list of chronic depression symptoms, and also noting Plaintiff's relative isolation from contact with others (Tr. 838). CE Bodkin did not provide an assessment of work-related limitations. *See id.*

The State Agency reviewed the available evidence and assessed Plaintiff's mental limitations at the initial and reconsideration levels in February 2020 and October 2020, respectively. At the initial level, the State Agency found that Plaintiff's "depressive, bipolar and related disorders" are a severe impairment (Tr. 187). It found, generally, that these impairments result in moderate limitation of Plaintiff's abilities to understand, remember or apply information, his abilities to interact, concentrate, persist, and/or maintain pace, and to understand, remember, and carry out detailed instructions (Tr. 192). He also had moderate limitation of his abilities to maintain attention and concentration for extended (two hour) periods; perform activities within a schedule; maintain regular attendance; and be punctual within customary tolerances; complete a normal workday and work week without interruption from mental impairments; and perform at a consistent pace without an unreasonable number of, or length of, rest periods. *Id.* He was moderately limited in his abilities to interact with the public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers (Tr. 193). The State

Agency explained, even more specifically, that Plaintiff is limited to routine, simple work tasks, not at a "fast assembly quota pace," no team activities or frequent interaction with others, and which allow off task behavior of up to 20% of the workday. *Id.* At the reconsideration-level review, the initial assessment of mental limitations was affirmed "as written" in the initial evaluation (Tr. 207).

On July 10, 2019, PA-C Meadows—Plaintiff's treating provider at the Southern Highlands Community Mental Health Center (*see* Tr. 1476)—submitted a brief letter reporting Plaintiff's diagnosis of schizoaffective disorder, bipolar type, and described Plaintiff as having a combination of emotional and mental problems that rendered "not suitable for gainful employment" him incapable of gainful employment because he cannot interact appropriately with coworkers and supervisors due to his chronic mental impairment symptoms, and would not be a suitable candidate for vocational rehabilitation (Tr. 778).

In her subsequent assessment in January 2021, she began by reporting that she has treated Plaintiff since July 2017, seeing him every 4 to 12 weeks, for treatment of schizoaffective bipolar disorder, for which he has a guarded prognosis (Tr. 928). Meadows assessed Plaintiff's work-related mental limitations, noting that she did not consider Plaintiff to be a malingerer or to demonstrate drug or alcohol abuse, and that he had been compliant with treatment (Tr. 928-29). She described "extreme limitation" in Plaintiff's abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination or proximity to others without being distracted, completing normal workdays and work-weeks at a consistent pace, accept instructions

and respond appropriately to criticism from supervisors, get along with coworkers without distracting them, respond to changes in the work setting, and tolerate normal levels of stress (Tr. 929-31). Meadows further identified "marked limitation" of Plaintiff's abilities to understand and remember simple and detailed instructions, make simple work-related decisions, and interact appropriately with the public (Tr. 929-30). Meadows concluded that Plaintiff's impairments would interfere with his ability to work at least 20% of the time and he would miss numerous days of work per month due to his mental impairments or due to receiving treatment for those mental impairments (Tr. 931). PA-C Meadows emphasized in her concluding remarks that Plaintiff is unable to interact with coworkers and supervisors due to his mental impairments, and Meadows did not believe Plaintiff was a suitable candidate for vocational rehabilitation. *Id.*

### 3. *Hearing Testimony*

Plaintiff testified first at the hearing before the ALJ on February 24, 2022. Regarding mental impairments, Plaintiff testified that his mental health has been affected since a mining accident in February 2016 that injured his left foot (Tr. 118). He testified that he takes medication for depression and to help him sleep. *Id.* In response to the ALJ's query regarding whether he had symptoms other than pain affecting his ability to work, Plaintiff testified that "I stay depressed. I am very depressed. I don't like to—I'm just not the same person that I used to be" (Tr. 118). He is still taking medication for his mental impairments, but it does not help much. *Id.* He has trouble sleeping, despite taking sleeping medication. *Id.*

In the "Function Report" he completed in connection with his initial claim for benefits, Plaintiff added that he does not read or write well and that his "thought process is worse" (Tr. 377-379). He is not motivated to engage in any of his previously-held

hobbies or interests (Tr. 378). His impairments affect his abilities to communicate, complete tasks, concentrate, understand, and get along with others (Tr. 379). He does not handle stress or changes in routine well; he has become rude and secluded and does not like being around people (Tr. 380). He concluded by stating that "I've become very depressed because I'm unable to be the dad I used to be. I've noticed a major change in my daily life, and in general my entire outlook on life[,] since my injuries" (Tr. 381).

At the hearing, the ALJ employed a vocational expert ("VE") to aid in determining whether Plaintiff could perform his past relevant work or other work. In response to a general query by the ALJ regarding employer tolerances for being "off task" outside of regularly scheduled breaks, the VE testified that "anything over 10% would be work preclusive" (Tr. 124). In response to a similar question regarding employers' tolerance for absenteeism, the VE agreed with the ALJ's assumption that someone who was missing 2 days of work per month would not be employable. *Id.* Furthermore, the VE testified that while a person with the same age, work background, and characteristics as Plaintiff would not be able to perform Plaintiff's past work, that there are jobs that exist in significant numbers in the national economy that such an individual could perform, including the representative occupations of surveillance-system monitor, document preparer, and touch-up screener (Tr. 101).

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential

evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the plaintiff." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a plaintiff must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether a plaintiff is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the plaintiff is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the plaintiff's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the plaintiff's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A plaintiff is entitled to a conclusive

presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the plaintiff's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The plaintiff's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining plaintiff's RFC as "the most the plaintiff can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the plaintiff's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a plaintiff's RFC, the ALJ must consider all of the plaintiff's medically determinable impairments . . . including those not labeled severe" as well as "all the plaintiff's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the plaintiff alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the plaintiff's

"pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the plaintiff has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the plaintiff's RFC in light of how the impairment constrains the plaintiff's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the plaintiff's RFC, the ALJ at the fourth step determines whether the plaintiff has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the plaintiff's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the plaintiff can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the plaintiff's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the plaintiff can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, ALJ Francine A. Serafin concluded that Plaintiff satisfied the insured-status requirements of the Social Security Act and was insured through the relevant time period (Tr. 85). She further determined that Plaintiff had not engaged in substantial gainful activity since February 1, 2019, the alleged disability-onset date (Tr. 85). The ALJ further found that Plaintiff had the following "severe" impairments: (1) post-foot-surgery status following traumatic crushing injury causing left foot drop, neuritis, and capsulitis of left lower extremity; (2) post-non-ST-elevation myocardial infraction (NSTEMI) and coronary stent placement status; (3) bilateral carpal tunnel syndrome with status post carpal tunnel release and removal of ganglion cyst on right upper extremity; (4) chronic systolic congestive heart failure; (5) hypertension; (6) sacroiliitis; (7) lateral epicondylitis; (8) arthralgia; (9) obesity; (10) degenerative disc disease (DDD) of the lumbar spine; (11) spondylosis of the cervical and lumbar spine; (12) schizoaffective disorder, bipolar type; (13) major depressive disorder; and (14) anxiety (Tr. 85). However, the ALJ found that none of these fourteen impairments, or a combination thereof, met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 86). Upon assessing Plaintiff's RFC, the ALJ determined that Plaintiff has the residual functional capacity to perform the following:

> lifting and carrying of 20 pounds occasionally and 10 pounds frequently but is essentially limited to sedentary exertion as he can only stand and walk for four hours total in an eight-hour workday and sit for four hours in an eight-hour workday. He can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. He is capable of frequently fingering, handling, and feeling with the bilateral upper extremities. He can perform no pushing, pedaling, or stomping with the left lower extremity. He is capable of tolerating only occasional exposure to cold, heat, wetness, humidity, and vibration. He should avoid all workplace hazards such as moving machinery or unprotected heights. He is capable of performing simple, routine, repetitive

17

work tasks that are not at an assembly line or production rate pace or involving any specific production quotas. He is capable of occasional interaction with the public. He requires the use of a cane in order to ambulate

(Tr. 89-90).

The ALJ concluded that—given the limitations imposed by the Plaintiff's RFC—he was unable to perform his past relevant work (Tr. 100). The ALJ enlisted the testimony of a Vocational Expert to aid in his finding that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of surveillance-system monitor, document preparer, and touch-up screener (Tr. 101). As a result, the ALJ concluded that Plaintiff was not under a disability during the relevant time period. (Tr. 102.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the

[ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a plaintiff is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.   ANALYSIS

Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a plaintiff's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. Here, it is undisputed that the ALJ appropriately followed the first step in finding that Plaintiff's mental-health impairments could be expected to produce the alleged symptoms claimed by Plaintiff's subjective statements. The parties' central contention is whether the ALJ then appropriately evaluated those symptoms at the second of the two-step process, where the ALJ is required to evaluate the intensity, persistence, and severity of the symptoms to determine "the extent to which they prevent the plaintiff from performing basic work activities." *Id.* §§ 404.1529(a), 416.929(a).

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' *Kevin F. v. O'Malley*, 5:23-CV-00305, 2024 WL 604747, at *10 (S.D.W. Va. Jan. 26, 2024), adopted, 2024 WL 580966 (Feb. 13, 2024). It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. *Id.* The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ]

evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

On review, the ALJ's analysis appears to be highly selective, improperly "cherry-picking" evidence such as "mental status findings of good eye contact," while ignoring, minimizing, or sidestepping other evidence with much more concrete and obvious impacts on Plaintiff's ability to sustain full-time work. Particularly striking was the ALJ's failure to address how Plaintiff's continued anger issues, including acting out physically (Tr. at 779-781, discussing punching walls, throwing, and breaking objects), as well as his anger triggers "specifically in group or public settings" (Tr. 828). Likewise, the ALJ summarily dismissed the July 10, 2019 letter from PA-C Meadows—Plaintiff's treater at Southern Highland Community Mental Health Center—because it contained a statement regarding an issue that is reserved for the Commissioner; however, the ALJ did not consider the remaining statements in the letter were relevant, such as Plaintiff's combination of emotional/mental problems and psychiatric symptoms which affect his ability to interact appropriately with co-workers and supervisors (Tr. 778).

Additionally, the ALJ pointed to Plaintiff's conservative treatment with medication, but glossed over that his medication was "adjusted" (Tr. 96) repeatedly, as his symptoms persisted—including repeated symptoms of suicidal ideation. For instance, the ALJ pointed to a single mental-status examination that was "essentially within normal

limits," and "his mood was reported as okay" in April 2021 in support of the ALJ's assertion that Plaintiff's "symptoms stabilized and he reported feeling much better and thinking more clearly than when he first arrived" (Tr. 96). Yet the ALJ makes no effort to square this single finding with Plaintiff's self-referral to the crisis stabilization unit only one month previously in March 2021 "due to suicidal thoughts with a plan." *Id.* Thus, while the ALJ was able to point to some office visits rendering somewhat benign findings, as explained in the Commissioner's *Brief* (*see* ECF No. 12 at 11), on review it appears that the ALJ relied upon selective and highly incomplete references only to those office notes in which the symptoms periodically waned. *See Testamark v. Berryhill*, 736 Fed. App'x 395, 398 (4th Cir. 2018) (explaining that "it is practically a hallmark feature of mental impairments that the symptoms and limitations of them wax and wane").

As this Court recently explained in *Kevin F.*, "the issue that necessitated remand in *Arakas* and similar decisions was that the ALJ overstated and misrepresented plaintiff's daily activities based on select facts in order to deny disability, and an accurate view of the record as a whole did not support it." *Kevin F.*, 2024 WL 604747, at *12. Here, just as in *Arakas*, without a more fulsome analysis by the ALJ to acknowledge the evidence that contradicted her ALJ's analysis, and discuss this evidence squarely—particularly the evidence of Plaintiff's significant emotional, mental, and psychiatric problems and symptoms which affect his ability to interact appropriately with coworkers and supervisors—the undersigned simply cannot find here that the ALJ's decision was supported by substantial evidence. Accordingly, the undersigned respectfully recommends that this matter be remanded for further consideration by the Commissioner.

### *IV.    CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's request to reverse the Commissioner's decision (ECF No. 11), **DENY** the Commissioner's request to affirm his decision (ECF No. 12), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Faber.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER:        March 4, 2024

Dwane L. Tinsley
United States Magistrate Judge